IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CHRISTINE B. POUND** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No.: 3:08-cv-00721-MJR-PMF |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

**REPORT AND RECOMMENDATION**

**FRAZIER, Magistrate Judge:**

This matter has been referred to United States Magistrate Judge Philip M. Frazier by United States District Judge Michael J. Reagan pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and SDIL-LR 72.1(a) for a Report and Recommendation. Plaintiff Christine B. Pound ("Pound") seeks judicial review of the final decision of the Social Security Administration ("SSA") denying her application for disability and disability insurance benefits filed on or about November 22, 2004. Pounds's application was denied by the Administrative Law Judge ("ALJ") when she rendered a decision finding that Pound was not disabled (Tr. 21-28). That decision became final when the Appeals Council declined to review the ALJ's findings (Tr. 5). Judicial Review of the Commissioner's final decisions is authorized by 42 U.S.C. § 405(g).

For the reasons set forth below, it is **RECOMMENDED** that Pound's complaint be **DENIED**, and that the Court adopt the following findings of fact and conclusions of law:

## I. Findings of Fact

### A. *Procedural History*

On November 22, 2004, Pound filed her application for disability and disability insurance benefits, alleging that her disability began July 6, 1998 (Tr. 19). After the SSA initially denied Pound's application, Pound timely filed a written request for hearing on July 14, 2005 (Tr. 19). On June 5, 2007, Pound testified at a Video Hearing (Tr. 19). On August 14, 2007, ALJ Anne Pritchett issued an unfavorable decision finding Pound not disabled prior to her date last insured ("DLI") of December 31, 2003, and denying the benefits sought by Pound in her Application (Tr. 19-28). On October 12, 2007, Pound timely filed her Request for Review of Hearing Decision (Tr. 11). On August 13, 2008, the Appeals Council denied Pound's Request for Review (Tr. 5), leaving the ALJ's decision as the final decision of the SSA. Pound has exhausted all administrative remedies.

### B. *Substantive History*

#### 1. Pound's Medical History

On January 15, 1998, Cesar Bello, M.D., noted a long-standing history of atypical chest pain which subsequently resolved, and gastroesophageal reflux (Tr. 184). Dr. Bello recommended testing for possible relapse of Pound's Helicobacter pylori[1] (R. 185). On February 2, 1998, Dr. Bello noted the confirmed presence of Helicobacter pylori, and prescribed medication (Tr. 181). He further noted that the bacterium "can also be associated with ulcer-like symptoms" and "the organism does have a tendency to recur with time." *Id.*

On January 28, 1998, Ward Neff, M.D., noted low back pain (Tr. 262). Dr. Neff also diagnosed "probable small previous anterior MI". *Id.* He recommended continued medication and physical therapy. *Id.* On February 4, 1998, a physical therapist at Deaconess Hospital noted

---

[1] Helicobacter pylori is a bacterium that inhabits various areas of the stomach and duodenum.

2

severe back pain beginning ten days prior with no indication of triggering factors (Tr. 151).
Pound reported a history of low back pain that flares up every 3 to 4 months. *Id.* The therapist
prescribed home exercises and deferred any further plan for a future conversation (Tr. 152).

On March 9, 1998, Dr. Neff noted a viral syndrome with nausea, vomiting and diarrhea,
and a history of Helicobacter pylori (Tr. 259). He diagnosed, among other things, resolving
gastroenteritis, recent leg contusion and resolving paresthesias. *Id.* That same day, Kenneth
Combs, M.D., saw Pound for resolving gastroenteritis (Tr. 259). Dr. Combs examined Pound's
abdomen and found it was essentially benign other than some muscular type soreness in her
lower quadrants (Tr. 259). Dr. Combs expected that Pound's diarrhea would resolve over the
next few days (Tr. 259).

On June 4, 1998, Dr. Neff diagnosed coronary artery disease, hypertension, chest pain
presumably related to angina, cerebrovascular disease, and other conditions (Tr. 250). Dr. Neff
also found Pound to be in no acute distress on that day. (Tr. 250). Between 1998 and 2001, Dr.
Neff diagnosed cerebrovascular disease on at least eight occasions, including June 4, 1998,
October 20, 1998, June 25, 1999, February 4, 2000, August 15, 2000, August 21, 2000,
November 14, 2000, and November 15, 2001, but on each of these occasions, Dr. Neff also
reported generally normal findings and described Pound as a person in no acute distress (Tr. 199,
207, 210, 223, 228, 236, 247, 250). None of Dr. Neff's subsequent notes indicate any significant
changes in Pound's cerebrovascular disease from the date of its first diagnosis.

On June 14, 1998, Satyam Tatineni, M.D., FACC, FACP, diagnosed atherosclerotic heart
disease and other conditions, but found Pound stable from the cardiac standpoint (Tr. 342). On
October 27, 1998, Pound underwent a cardiac evaluation at The Heart Group (Tr. 332-39). John
Oak, M.D., FACC, noted prior hospitalization in December and January of 1997, for chest pain.
*Id.* Dr. Oak further noted visual changes and dizziness, and an objectively positive treadmill

3

study suggesting exercise induced myocardial ischemia (Tr. 333-34). John Ansbro, M.D., FACS, noted history of suspected vasospasm, and imaging suggesting progression of disease in the right carotid system (Tr. 332). However, Dr. Ansbro recommended no surgical intervention at that time. *Id.*

On June 25, 1999, Pound returned to Dr. Neff with increased frequency of chest pain, sleep issues, palpitations, nausea and other complaints (Tr. 236). Dr. Neff diagnosed possible herniated disc and coronary artery disease, among other conditions. *Id.* On July 22, 1999, Donna Lorenzo-Bueltel, M.D., diagnosed Pound with loss of vision in half of her right eye (Tr. 163). She further diagnosed possible lumbosacral stenosis and left upper extremity paresthesia, and recommended an MRI and nerve conduction studies (Tr. 164). On July 23, 1999, Pound underwent an MRI as ordered by Dr. Lorenzo-Bueltel (Tr. 160-61). That MRI revealed: (i) disc damage in the nature of a herniation in the low back at L5-S1 and L4-L5; (ii) abnormal brain findings including small vessel changes; and (iii) abnormal carotid findings including severe disease in the right internal carotid and mild disease in the left carotid. *Id.*

On August 5, 1999, Dr. Tatineni reported that Pound recently suffered from transient ischemic attack, and noted an MRI revealing significant disease of the right carotid artery (Tr. 326). Dr. Tatineni diagnosed atherosclerotic heart disease, hypercholesterolemia, nicotine dependence, cerebrovascular disease, systemic hypertension, and suspected GERD. *Id.*

On September 30, 1999, Dr. Bello noted longstanding reflux, and noted increased dyspepsia despite using Prilosec (Tr. 179). Between 1998 and 2001, Dr. Neff diagnosed nocturnal myoclonus on at least seven occasions, including October 20, 1998, June 25, 1999, February 4, 2000, August 15, 2000, August 21, 2000, November 14, 2000, and November 15, 2001 (Tr. 199, 207, 210, 223, 228, 236, 247). On August 21, 2000, Pound complained to Dr. Neff of abdominal pain in all four abdominal quadrants, and Dr. Neff recommended an

abdominal CT with contrast and use of Imodium (R. 210).  On November 14, 2000, Pound complained to Dr. Neff of blood pressure "bouncing around" and episodes of chest pain and significant headache (Tr. 207).  Dr. Neff increased her medication and scheduled an MRA. *Id.*

On November 15, 2000, Pound underwent a brain MRI and head MRA as ordered by Dr. Neff (Tr. 206). That examination revealed: (i) small vessel ischemic change in the brain; (ii) mild narrowing of the carotids; and (iii) stable cyst in the head. *Id.*  On March 29, 2001, Pound reported to Dominic Cefali, M.D., PhD, episodes of left arm and hand discoordination, confusion, fatigue, and weakness for six weeks, including one episode of left arm jerking that lasted for five minutes (Tr. 306).  Dr. Cefali recommended a neurological consultation and annual screening duplex doppler study imaging of the carotid tree (Tr. 307).

On December 17, 2001, Pound visited J. Dennis Amorado, M.D., complaining of chest pain almost every day (Tr. 501).  Dr. Amorado prescribed nitroglycerin for coronary artery disease with symptoms of stable angina, Zestril for hypertension, Lipitor for hyperlipidemia, and Prilosec for gastroesophageal reflux disease (Tr. 502).

On February 4, 2002, Brian Jones, M.D., noted intermittent episodes of chest discomfort not related to activity (Tr. 299).  On February 11, 2002, an echocardiogram report revealed mild aortic valve sclerosis, trace mitral insufficiency and trace tricuspid insufficiency (Tr. 356).  On May 6, 2002, Pound visited Dr. Jones with episodes of chest heaviness and shortness of breath, with one episode of severe chest discomfort associated with nausea, fatigue, and lightheadedness with near loss of consciousness (Tr. 298).  On June 5, 2002, Dr. Jones noted that Pound's coronary artery disease appeared adequately controlled with present medication (Tr. 297).

On March 17, 2003, Pound visited Dr. Amorado, reporting occasional episodes of chest pain (Tr. 488). Dr. Amorado recommended continuing with her current medications for her coronary artery disease. *Id.*  On July 15, 2003, Pound complained to Dr. Amorado of pain in the

flank area aggravated by standing and walking and relieved by sitting (Tr. 486).  Dr. Amorado diagnosed low back pain likely secondary to muscle strain. *Id.*  On September 18, 2003, Dr. Amorado noted aching in the right arm with occasional numbness and tingling (Tr. 481). Dr. Amorado considered a possible circulatory problem as a cause of the arm pain. *Id.*

### 2. **Pound's Disability Application**

In the conditions section of her Disability Report form dated November 24, 2004, Pound listed "undifferentiated systemic autoimmune disorder with lung, brain and vascular involvement, spinal injury, chronic gastritis and long term history of progressive health problems"; stated that cognitive changes affect her communication and concentration; (iii) stated she stopped working on July 8, 1998, due to her health conditions; (iv) described symptoms including chronic spinal inflammation and pain, vertigo, angina, and fatigue; and (v) indicated that her conditions arose eight years prior (Tr. 69-84).

In Pound's Activities of Daily Living Questionnaire from January 10, 2005, Pound stated that: (i) her right arm and hand loses function with continuous usage; (ii) she can drive in emergencies, subject to possibilities of vertigo, angina, memory loss and vision disturbances; (iii) she cannot sit more than 30 minutes due to back pain; (iv) she requires rest periods during the day; (v) she can stand only 30 minutes due to back and leg pain; (vi) her conditions affect cooking, shopping and household chores (Tr. 110 – 114).

Pound's husband completed a Function Report on January 10, 2005 in which he indicated that: (i) Pound spends 30 to 45 minutes on chores before needing rest; (ii) she can sew, knit or work on the computer for 30 minutes before headaches prevent further activity; (iii) Pound's history of nocturnal seizures or Periodic Limb Movement Disorder affects her sleep; (iv) arm pain causes difficulty with personal care; (v) she can ride a lawnmower over smooth surfaces but most days cannot complete household chores, and requires rest after 30 minutes; (vi) Pound

cannot shop for long periods of time; (vii) Pound can no longer lift heavy objects and drops even light objects; (viii) she can walk 30 minutes or less; (ix) back pain and Periodic Limb Movement Disorder limit her sitting; (x) Pound experiences short-term memory loss and difficulty concentrating; and (xi) Pound used to be a high producer at work before her conditions began (Tr. 92-101).

Pound obtained statements from Steven Gibson, Cheryl Rowans, Thomas Rowans, Michael Crow, Brandon Steele, and Edwin Gajewski regarding her conditions and limitations. Gibson stated Pound developed one health problem after another, sometimes mixed up letters in simple words, and sometimes became dizzy and fell (Tr. 589 – 590). Cheryl Rowans described Pound coughing up blood and being diagnosed with Wegener's disease, and indicated that Pound would confuse simple objects (Tr. 591 – 594). Thomas Rowans indicated Pound could not drive, and got dizzy and hurt herself (Tr. 595 – 596). Crow described Pound's pain due to a back injury, and Pound's need for help from her mother (Tr. 597 – 599). Steele described Pound needing to learn to use her left hand, stumbling and hurting her head, forgetting things and needing to use a hammock due to back pain (Tr. 600 – 602). Gajewski described the circumstances surrounding Pound's use of a bulldozer, stating that "I let her try to use it for a minute", and explained it required his help in lifting Pound up to the machine (Tr. 603 – 604).

On March 22, 2005, Dr. Amorado prepared a medical source statement regarding Pound's limitations (Tr. 455). He indicated a five-pound maximum occasional lifting ability, and three-pound maximum frequent lifting ability. *Id.* Dr. Amorado further indicated that Pound could stand or walk three hours in an eight-hour day, and only 15 minutes without interruption. *Id.* He stated that Pound could sit for five hours, or thirty minutes without interruption, and that she should elevate her feet when sitting (Tr. 456). He stated that she cannot complete an eight hour work day without lying down. *Id.* Dr. Amorado indicated that Pound could never climb or

7

balance, and could occasionally stoop, crouch, kneel and crawl. *Id.* He stated that Pound's impairments affect reaching, handling, feeling, pushing/pulling and speaking. *Id.* He stated that environmental restrictions should apply regarding heights, moving machinery, temperature extremes and chemicals (Tr. 457). Dr. Amorado indicated that Pound's condition affects typing and writing, and that she cannot drive regularly anywhere due to dizziness. *Id.* Dr. Amorado indicated that these restrictions arose from MRI's of the neck and low back showing bulging discs, from cervical and lumbar neuropathy, abnormal brain MRI, and mini-strokes (Tr. 455-57). He indicated that the impairments began on December 17, 2001 and would last indefinitely, and further stated "I first saw the patient on 12/17/01 although she claims that the symptoms started prior to that" (Tr. 457).

On June 20, 2006, William Raino, M.D., signed a medical source statement agreeing with Dr. Amorado's March 22, 2005, statement (Tr. 547).

### 3. SSA Hearing

At her hearing, Pound testified that she earned a Bachelor degree in Accounting, and completed one year of a Master degree (Tr. 609). Pound stated that she was an accounting manager at American General for 7 years until she stopped working there on July 6, 1998 after a mass on her lung began causing a lot of symptoms (Tr. 609 – 610). Among the symptoms that caused Pound to leave her job included chest pains that led to a heart attack, fatigue, loss of strength, difficulty writing normally, brain lesions, vertigo, loss of memory, headaches, and minor seizures (Tr. 611 – 615). Since leaving her job, in addition to the symptoms mentioned above, Pound has suffered from lower back pain, difficulty walking for more than 5 minutes, difficulty sitting for more than 30 minutes, loss of strength in her right arm, restless leg syndrome, and fevers (Tr. 616 – 625). At her hearing, Pound acknowledged that in 2003, she had operated a bulldozer for approximately 30 minutes (Tr. 628 – 629). Although Pound left her

8

job in July of 1998, she waited until November of 2004 to apply for disability benefits because she never thought that she was disabled, and that she thought her medical problems were only temporary (Tr. 630).

Pound's mother, Joyce Marie Bateman testified that Pound could not use a broom or do the mopping for the house, and that Bateman did most of the cleaning (Tr. 631). Bateman also testified that she did most of the cooking and all of the grocery shopping (Tr. 631).

Daryl Taylor, an Associate Professor at Southern Illinois University, classified Pound's former job as an accounting manager as an accounting clerk supervisor, and stated that it was classified as a sedentary and skilled job (Tr. 637). Taylor testified that based on Pound's testimony, a person with her limitations could not function in this type of position due to fatigue as well as the limitations in memory and concentration that she described, and that Pound's trouble sitting or standing for extended periods of time would preclude competitive employment (Tr. 640 – 641).

## II.     Conclusions of Law

### A. *Legal Background*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive…."); *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); See also *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (a reviewing court is not allowed to substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1972) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002); *Green v. Shalala,* 51 F.3d 96, 101 (7th Cir. 1995). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Golembiewski*, 32 F. 3d at 915; *Cannon v. Apfel,* 213 F.3d 970, 974 (7th Cir. 2000). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex. rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

Disability insurance benefits are available only to those individuals who can establish a "disability" under the terms of the Social Security Act.  The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations enumerate a five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing a disability. 20 C.F.R. § 416.920.  The ALJ must first consider whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. § 416.920(b).  If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c).  If the claimant's impairment is not severe, then the process is over, and the claimant is considered not disabled.  If the finding is severe, however, the ALJ must proceed to step three.

At step three, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. § 416.920(d). If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. *Id.* However, if the impairment does not so limit the claimant's remaining capabilities, in step four, the ALJ reviews the claimant's "residual functional capacity" ("RFC") and the physical and mental demands of his past work. 20 C.F.R. § 416.920(e). If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. 20 C.F.R. § 416.920(f). However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts, at step five, to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(g). If either Plaintiff is determined not capable to perform other work or such work does not exist in the national economy, the ALJ will enter a finding that Plaintiff is disabled.

The law governing disability determinations provides that ALJs are not required to discuss every piece of evidence; however, they must build a bridge of logic connecting evidence to their conclusion. Regarding credibility assessments, they must articulate the reasons behind their evaluation. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). This standard is not high – only minimal articulation is needed – enough to allow a reviewer to follow the ALJ's thought process. Once the Court understands the ALJ's reasoning, it can determine whether the rationale has support in the administrative record and meets the applicable legal standard. When the ALJ does not minimally discuss or explain the reasons for rejecting evidence, the Court cannot initiate its review. The first step towards determining whether an adverse credibility

decision is proper and supported is to understand the basis for the assessment; that is, to know why the ALJ discredited the evidence. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

   **B. *ALJ's Decision***

After considering the evidence, the ALJ concluded the Pound was not under a disability from her last day of employment through the date last insured (Tr. 19).

At step one of the five-step sequential evaluation, the ALJ determined that Pound had not engaged in substantial gainful activity from her alleged onset date of July 6, 1998 through the DLI (Tr. 21). At step two, the ALJ found that Pound suffered from severe impairments including coronary artery disease, carotid artery disease and degenerative disc disease. *Id.* The ALJ excluded undifferentiated autoimmune disorder from her finding, stating that no physician diagnosed such impairment and that no symptoms existed prior to the DLI. *Id.* In excluding Pound's seizure disorder from her findings, the ALJ stated "there is no evidence of any seizure disorder prior to July 2004 at the earliest." *Id.* In excluding brain lesions as a severe impairment, the ALJ stated that imaging studies showed only probable small vessel disease, and stated that Pound had no mental complaints from August 1999 through July 2004 (Tr. 22). She further stated that "no physician has described objective findings of mental deficit". *Id.*

At step three, the ALJ found that Pound did not suffer from an impairment or combination of impairments of a severity that meets or medically equals the required severity of a listing. *Id.* Prior to step four, the ALJ determined that Pound had the RFC through the DLI to perform the full range of sedentary work. *Id.*

At step four, the ALJ concluded that Pound's past relevant work as an accounting clerk supervisor did not require the performance of work-related activities precluded by Pound's RFC. *Id.*

At step five, the ALJ found that Pound was not under a disability at any time from the alleged onset date through the DLI (Tr. 27).

*C. Analysis*

Pound raises two arguments in this appeal. Her first argument is that even though the ALJ determined that Pound had at least three severe impairments including coronary artery disease, carotid artery disease, and degenerative disc disease, the ALJ nonetheless erred in excluding cerebral vascular disease, seizures, and connective tissue disorder / undifferentiated autoimmune disorder as severe impairments. Pound's second argument is that the ALJ erred in determining that Pound had the RFC to complete her job as an accounting manager; drawing this conclusion, in part, by disregarding the limitations found by Drs. Amorado and Raino.

1. **The ALJ's Exclusion of Several Conditions**

The first issue that the Court must decide is whether the ALJ erred in failing to include cerebral vascular disease, seizures, and connective tissue disorder / undifferentiated autoimmune disorder as severe impairments.

With respect to cerebral vascular disease, the ALJ stated that Pound "did not have evidence of a significant cerebrovascular accident…" (Tr. 22). It is clear from the record that Dr. Neff diagnosed Pound with cerebral vascular disease on at least 8 occasions between 1998 and 2001 (Tr. 199, 207, 210, 223, 228, 236, 247, 250). An MRI of Pound's brain on July 23, 1999 revealed that she had small vessel changes (Tr. 160 – 161) and that a November 15, 2000 MRI revealed small vessel ischemic change in the brain (Tr. 206). Nonetheless, on each occasion when Dr. Neff diagnosed cerebral vascular disease, he also noted that Pound was in no acute distress, and that his notes following Pound's MRIs do not mention any significant changes in her condition. In her opinion, the ALJ made reference to Pound's brain MRIs, as well as Dr. Neff's subsequent notes stating that Pound did not have the same complaints she had prior to the

13

MRIs.  Although the ALJ did not discuss Dr. Neff's previous diagnoses of cerebral vascular disease, she built a sufficient "bridge of logic" connecting the evidence above to her determination that Pound's cerebral vascular disease was not a severe impairment.  In particular, while Pound was diagnosed with cerebral vascular disease on at least eight occasions by Dr. Neff, Neff's subsequent notes did not note a change in this condition.  Thus, the ALJ provided sufficient evidence that Pound had not suffered from any significant impairments related to her cerebral vascular disease.  The ALJ, therefore, did not err in excluding cerebral vascular disease from her finding of severe impairments.

As to Pound's seizures, the ALJ stated that Pound "has alleged that she has seizures that are limiting. However, there is no evidence of any seizure disorder prior to July 2004 at the earliest" (Tr. 21).  In making this conclusion, the ALJ stated that "Dr. Raino eventually diagnosed the claimant with a seizure disorder in late 2005, although visual evoked potential and electronystagmography testing was normal, and EEG readings were non-specific" (Tr. 25).  Although Pound alleges that an episode of left arm jerking lasting for 5 minutes (Tr. 306) and her husband's discussion of her "nocturnal seizures" (Tr. 85 – 101) provide clear evidence of a seizure disorder, such evidence is not conclusive of such a condition.  The evidence from the record does not provide conclusive evidence of a seizure disorder prior to Pound's DLI, and thus, the ALJ did not err in excluding seizures as one of Pound's severe impairments.

Regarding Pound's claim for connective tissue disorder / undifferentiated autoimmune disorder, the ALJ concluded that "these were not medically determinable impairments as of the claimant's date last insured" (Tr. 21).  In support of this conclusion the ALJ stated that "Dr. Raino noted the claimant had not been diagnosed with connective tissue disease (Ex. 19F). P. Ranganathan, M.D., a rheumatologist, examined the claimant on October 13, 2004.  He noted the

14

claimant had multiple positive ANA titres, but that all other testing had been negative for connective tissue disease or rheumatoid arthritis" (Tr. 25).  The ALJ continued stating "the above objective evidence does not support the claimant's allegations of connective tissue or autoimmune disease" *Id.*  Additionally, the ALJ stated that Pound had not been treated for connective tissue disease, despite claiming that she was diagnosed with it (Tr. 23).  Although Pound argues that she suffered from symptoms related to connective tissue disease, the evidence in the record is not conclusive as to whether these symptoms were a result of connective tissue disorder, or one of Pound's conditions that the ALJ did consider a severe impairment.  Thus, there is no clear evidence that the ALJ erred in failing to find that Pound suffered a severe impairment from connective tissue disorder / undifferentiated autoimmune disorder prior to her DLI.

### 2. The ALJ's Conclusion Regarding Pound's RFC

Pound argues that the ALJ erred by rejecting the opinion of Dr. Amorando and, by extension, that of Dr. Raino regarding Pound's limitations.  In making the determination of whether Pound had the RFC required to perform her duties as an accounting manager, the ALJ stated that medical evidence did not support Dr. Amorado's opinions (Tr. 23 – 27).  Specifically, the ALJ stated that "in comparing the residual functional capacity the claimant had as of the date last insured with the physical and mental demands of this work, the undersigned finds that the claimant was able to perform it as it was generally performed" (Tr. 27).  The ALJ noted Dr. Amorado's restrictive lifting, standing, and sitting limitations for Pound, but also found that Dr. Amorado's notes did not support these findings (Tr. 26).  The ALJ found that Dr. Amorado's office notes reported a decline only after the DLI (Tr. 28).  Dr. Amorado noted that Pound had been doing a lot of work around the house lately, and that she had, in fact, been operating a

bulldozer (Tr. 486). In addition, Dr. Neff observed in June 1999 that Pound had been doing a lot of work outside her farm on Wren Lake (Tr. 236). Given the fact that Pound was able to operate heavy machinery and work outside on her farm, the ALJ does not appear to have erred in disregarding Dr. Amorado's opinion that Pound should only occasionally lift more than 3 pounds, that she could only stand or walk for 3 hours per day, and that she could not complete an 8 hour work day without lying down (Tr. 456). The contradiction between Pound's operation of a bulldozer and riding lawnmower, as well as her ability to perform work outside on her farm, with Dr. Amorado's highly restrictive lifting, standing, and sitting limitations, clearly supports the ALJ's conclusion that Pound had the RFC to perform in a sedentary position similar to her prior job as an accounting manager.

## Conclusion

For the above reasons, it is **RECOMMENDED** that Plaintiff's complaint be **DENIED**, and that the Court adopt the foregoing findings of fact and conclusions of law.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1 (b), the parties shall have ten (10) days after service of this recommendation to file written objections thereto. The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or Court of Appeals. *Snyder v. Nolen*, 380 F.3d 279, 284 (7th Cir. 2004); *United States v. Hernandez-Rivas*, 348 F.3d 595, 598 (7th Cir. 2003).

**DATED: January 21, 2010.**

s/ *Philip M. Frazier*
**PHILIP M. FRAZIER**
**UNITED STATES MAGISTRATE JUDGE**