IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHRISTINE POUND, | \| |
| | \| |
| Plaintiff/Petitioner, | \| |
| | \| |
| vs. | \|   Case No. 08-cv-0721-MJR-PMF |
| | \| |
| MICHAEL J. ASTRUE, | \| |
| Commissioner of Social Security, | \| |
| | \| |
| Defendant/Respondent. | \| |

**MEMORANDUM AND ORDER**

REAGAN, District Judge:

**A.    Introduction and Procedural History**

This action seeks judicial review of a final decision of the Commissioner of Social Security pursuant to Section 205 of the Social Security Act, 42 U.S.C. § 405(g). Christine Pound challenges the denial of her claim for disability and disability insurance benefits.

Pound applied for benefits in November 2004, alleging that she was disabled and that her disability began on July 6, 1998. After the Social Security Administration denied the application, Pound filed a written request for hearing on July 14, 2005. Pound testified at the hearing on June 5, 2007. On August 14, 2007, Administrative Law Judge (ALJ) Anne Pritchett ruled against Pound, concluding that she was not disabled prior to her date last insured (DLI). Pound timely requested review of the hearing decision. The Appeals Council denied that request for review on August 13, 2008, rendering the ALJ's decision the final decision of the Social Security Administration.

Pound exhausted all administrative remedies prior to filing this suit in October 2008.

### B. Applicable Legal Standards

Section 205 of the Act provides that the Commissioner's finding "as to any fact, if supported by substantial evidence, shall be conclusive." **42 U.S.C. § 405(g)**. So this Court must affirm the denial of disability benefits as long as the ALJ's decision is supported by substantial evidence. *Skinner v. Astrue,* **478 F.3d 836, 841 (7th Cir. 2007)**. "Evidence counts as 'substantial' so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'" *Ketelboeter v. Astrue,* **550 F.3d 620, 624 (7th Cir. 2008)**, *quoting Jens v. Barnhart,* **347 F.3d 209, 212 (7th Cir. 2003)**. *Accord Nelms v. Astrue*, **553 F.3d 1093, 1097 (7th Cir. 2009);** *Richardson v. Perales*, **402 U.S. 389, 401 (1971).**

Although not required to address every piece of evidence or testimony presented, the ALJ must furnish a logical bridge between the evidence and her conclusions. *Getch v. Astrue,* **539 F.3d 473, 480 (7th Cir. 2008);** *Rice v. Barnhart,* **384 F.3d 363, 369 (7th Cir. 2004).** This Court reviews the record as a whole and may *not* re-weigh the evidence or substitute its judgment for the ALJ's. *Terry v. Astrue,* **580 F.3d 471, 475 (7th Cir. 2009).** *See also Ketelboeter,* **550 F.3d at 624,** *citing Schmidt v. Apfel,* **201 F.3d 970, 972 (7th Cir. 2000).** Thus, even if reasonable minds could differ about whether a claimant is disabled, the Court must affirm the ALJ's decision as long as that decision had adequate support. *Simila v. Astrue,* **573 F.3d 503, 513 (7th Cir. 2009);** *Elder v. Astrue,* **529 F.3d 408, 413 (7th Cir. 2008).**

### C. <u>Analysis</u>

To qualify for disability benefits, a claimant must be "disabled," defined by the Social Security Act as unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009), *quoting* 42 U.S.C. § 423(a)(1)(E), and § 423(d)(1). Additionally, a claimant must show that the disability arose while she was insured for benefits. *Id.*, citing § 423(a)(1)(A), § 423(c)(1), *and Sienkiewicz v. Barnhart,* 409 F.3d 798, 802 (7th Cir. 2005)(per curiam).

Social Security regulations prescribe a five-step test to determine whether a claimant is disabled within the meaning of the Act. *Liskowitz,* 559 F.3d at 740, *citing* 20 C.F.R. §§ 404.1520. The United States Court of Appeals for the Seventh Circuit has described this sequential five-step analysis as follows:

> The <u>first step</u> considers whether the applicant is engaging in substantial gainful activity.
>
> The <u>second step</u> evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement.
>
> The <u>third step</u> compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues.

> The fourth step assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled.
>
> The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008), *emphasis added*, *citing* 20 C.F.R. § 404.1520 (pertaining to disability insurance benefits) and § 416.920 (pertaining to supplemental security income).

In the case at bar, at step one, the ALJ found that Pound had not engaged in substantial gainful activity from her alleged disability onset date (July 6, 1998) through the date she was last insured/DLI (December 31, 2003).

At step two, the ALJ found that Pound suffered from one or more severe impairments, including coronary artery disease, carotid artery disease, and degenerative disc disease. The ALJ concluded that several other conditions did *not* constitute severe impairments.[1]

---

[1] The ALJ excluded autoimmune disorder as a severe impairment because no physician had diagnosed that impairment and no symptoms existed prior to the DLI. The ALJ excluded a seizure disorder because there was no evidence of any seizure disorder prior to July 2004. The ALJ excluded brain lesions because imaging studies showed only small vessel disease, Pound had no mental complaints from August 1999 through July 2004, and no physician had described objective findings of any mental deficit.

At step three, the ALJ found that Pound did *not* suffer from an impairment or combination of impairments that met or equaled the severity of those in the "Listing of Impairments." The ALJ also found that Pound had the RFC through her DLI to perform a full range of sedentary work.

At step four, the ALJ found that Pound could perform her past relevant work as an accounting clerk supervisor – i.e., that position did not require Pound to perform work-related activities *precluded* by her RFC.

At step five, the ALJ found that Pound was not under a disability at any time from the alleged onset date through the DLI.

In her appeal from that decision to this Court, Pound raised two central arguments: (a) Pound challenged the ALJ's failure to include as severe impairments several of her conditions or diseases – such as cerebral vascular disease and seizure disorder; and (b) Pound challenged the ALJ's determination that Pound had the RFC to perform her job as an accounting clerk supervisor.

In his Report and Recommendation issued January 21, 2010 (R&R), Magistrate Judge Frazier rejected both of Pound's challenges and recommended that the undersigned District Judge affirm the ALJ's decision. Pound objected to the R&R on February 4, 2010. Timely objections having been filed, the undersigned Judge undertakes de novo review of the portions of the R&R to which specific written objection was made. **28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b)(3); Southern District of Illinois Local Rule 73.1(b).** The Court may accept, reject or modify the recommended

decision, receive further evidence, or return the matter to the Magistrate Judge with instructions.  **Fed. R. Civ. P. 72(b)(3); Local Rule 73.1(b**).

In the instant case, Pound specifically objects to three portions of the R&R (her second and third objection overlap somewhat).  The Court considers each of the objections in turn, but bearing initial note is the fact that an extensive medical record was presented to the ALJ and reviewed by Magistrate Judge Frazier.

The detailed medical history discussed by Pound in her brief alone (Doc. 11) references the reports of over a dozen medical doctors and recounts a history of medical complaints and treatments spanning from February 1995 through March 2005,  including erosive gastritis, sleep issues, recurring back pain, excruciating headaches, Helicobacter pylori (a bacterium which inhabits the stomach and duodenum and produces ulcer-like symptoms), cardiac catheterizations, MRIs, carotid ultrasounds, nerve conduction studies, abdominal CTs, thallium stress studies, and a right carotid endarterectomy.  The Court need not recount all of that material here, instead summarizing the evidence that relates to Pound's objections to Magistrate Frazier's R&R.

> ◉   Objection 1: "The Magistrate did not properly apply the legal standard regarding the determination of severe impairments in analyzing the ALJ's decision."

As noted above, the ALJ rejected several of Pound's conditions – including cerebral vascular disease – as *severe* impairments.  Pound asserts that the ALJ mischaracterized the medical evidence in reaching this decision and improperly equated

the lack of acute distress with a lack of severe impairment. Pound believes Magistrate Judge Frazier repeated this misread of the medical evidence and misunderstood what is required for something to constitute a severe impairment.

Specifically, Pound takes issue with this portion of the R&R (Doc. 13, p.13): "It is clear from the record that Dr. Neff diagnosed Pound with cerebral vascular disease on at least 8 occasions between 1998 and 2001 (Tr. 199, 207, 210, 223, 228, 236, 247, 250).... Nonetheless, on each occasion... [Dr. Neff] also noted that Pound was in no acute distress, and ... his notes following Pound's MRIs do not mention any significant changes in her condition."

20 C.F.R. § 404.1521(a) provides that an impairment or combination of impairments is *not* severe "if it does not significantly limit your physical or mental ability to do basic work activities." Pound points out that this definition does not depend on whether Pound was in "acute distress" at any particular time, and just because a doctor does not note a change in a condition does not rule out the possibility that the individual suffers from a severe impairment.

The Court is not persuaded by this assertion. The lack of acute distress and changing condition clearly were relevant to assessment of Pound's condition, so they were properly noted. But they were not the only grounds supporting the finding that Pound's vascular disease did not constitute a severe impairment.

Dr. Neff was Pound's treating family physician. His earliest notes (dated June 4, 1998) reported Pound in no acute distress and also noted regular rate and rhythm

of the heart with no abnormal sounds. Dr. Neff made the same observation on October 20, 1998 – normal heart rhythm, rate and sounds. In June 1999, when Pound complained to Dr. Neff about chest pain, Neff noted that Pound had been performing a lot of work outside her farm and that her pain could be relieved with a single sublingual nitroglycerin tablet. Neff's physical examination concluded that she was not in acute distress. In February 2000, Dr. Neff was disappointed that Pound had resumed smoking following an August 1999 carotid endarterectomy, but she reported no chest pain. In August 2000, Dr. Neff found Pound to be in generally good health. In November 2000, Dr. Neff noted some evidence of reflux problems after ordering an EGD (esophagogastroduodenoscopy) but pronounced her examination otherwise "quite good."

       The notes continue in this pattern. On November 2000, Dr. Neff reported normal heart rate, rhythm and sound. An MRI that month showed probable mild narrowing of the bilateral carotid arteries at the level of the carotid siphon but no aneurysms. Other scans of her head revealed no lesions or intra-cranial edema. In November 2001, Dr. Neff listed cerebrovascular disease as one of seven diagnoses for Pound, but he again noted no acute distress, as well as normal blood pressure.

       In December 2001, Dr. J. Dennis Amorado diagnosed coronary artery disease with stable angina and stable hypertension. In March 2003, Dr. Amorado noted that Pound's occasional episodes of chest pain were relieved by nitroglycerin, and her coronary artery disease was stable. In July 2003, Dr. Amorado noted that Pound's complaints of left flank pain came afer she had been doing a lot of work and "operating

a bulldozer." When Pound complained of weakness in her right arm in September 2003, Dr. Amorado ordered a complete neurological examination which revealed normal reflexes and no sensory deficits. A June 2004 stress test indicated that Pound had normal cardiac function and no evidence of ischemia by EKG or echo images.

This Court's task is not to freshly evaluate the medical evidence. *See Jens*, **347 F.3d at 212;** *Rice*, **384 F.3d at 369.** The ALJ's determination that Pound's cerebral vascular disease was not a severe impairment is supported by substantial evidence and reflects a thorough consideration of that evidence. The Court rejects Pound's first objection to Magistrate Judge Frazier's R&R.

> ◘ Objection 2: "The ALJ, and by extension the Magistrate, did not properly weigh the opinions of the treating physicians, including those of Dr. Amorado and Dr. Raino, as provided in 20 C.F.R. § 404.1527(d)."

Pound emphasizes that under the applicable regulations, an examining doctor's opinion should receive more weight than a non-examining physician, and a treating physician's opinion should be given more weight than a non-treater's opinion. **20 C.F.R. § 404.1527(d).** Pound also points out that when weighing medical evidence, the ALJ should consider the extent of the treating relationship, the specialization of the physician, and whether the opinions are consistent with the medical evidence. Pound criticizes the ALJ here for not specifically mentioning the treating and examining relationships of Dr. Amorado and Dr. William Raino and for not acknowledging that their opinions were consistent with the medical evidence.

The Court finds no merit in Pound's second objection. The ALJ was aware of the nature of – and properly weighed – the medical evidence before her. It is true that the regulations require an ALJ to give opinions by treating physicians controlling weight, but only if the opinions are supported by medical findings and consistent with substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); *Simila*, 573 F.3d at 514-15. *Accord Ketelboeter*, 550 F.3d at 625 (a treating physician's opinion as to the nature and severity of a claimant's injuries controls only when "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "consistent with substantial evidence in the record." ).

Thus, for instance, if the opinion of a treating physician (such as Dr. Amorado) is inconsistent with a consulting physician's opinion, is internally inconsistent, or is based solely on the patient's subjective complaints, the ALJ may discount it. *Id*. Here, the ALJ found Dr. Amorado's opinions not supported by the medical evidence and contradicted by the record.

In March 2005, Dr. Amorado prepared a medical source statement addressing Pound's limitations. His severe restrictions including the following: a 5-pound maximum occasional lifting ability and 3-pound maximum frequent lifting ability; standing or walking only three hours in an 8-hour day, and only 15 minutes without interruption; and sitting only thirty minutes without interruption, *with* her feet elevated. Dr. Amorado concluded that Pound could not complete an 8-hour work day without lying down, that she never could climb or balance, and she could only

occasionally stoop or crouch.  Dr. Amorado believed that Pound's condition affected her typing and writing, and that she could not drive regularly due to dizziness.  Dr. Amorado based these restrictions on bulging discs, cervical and lumbar neuropathy, abnormal brain MRI and mini-strokes.[2]

The ALJ considered the March 2005 Amorado assessment and specifically found that Dr. Amorado's office notes did not support the findings contained therein.  For example, the ALJ described how the office notes did not demonstrate any evidence of neuropathy *prior to* Pound's DLI.  The ALJ stated that the office notes only revealed a decline beginning in mid-2004, which was after the December 31, 2003 DLI.  The ALJ reached similar conclusions as to Pound's claim regarding seizure disorder.  The ALJ stated that although Pound claimed to experience seizures that were limiting, her test results were normal, Dr. Raino diagnosed the seizure disorder in late 2005, and "there is no evidence of any seizure disorder prior to July 2004 at the earliest."

The ALJ found Dr. Amorado's March 2005 assessment of Pound's limitations contradicted by Dr. Neff's 1999 notes, by Dr. Amorado's own 2003 notes, and by Pound's activities outside the workplace.  As the Commissioner correctly noted it his brief: "statements from two treating doctors supported the ALJ's rejection of Dr. Amorado's rather severe restrictions as expressed on the 2005 form." **Doc. 12 at p. 14**, *citing*

---

[2]  Dr. William Raino signed a statement in June 2006 agreeing with Dr. Amorado's March 2005 statement.

***Reynolds v. Bowen*, 844 F.2d 451, 454 (7th Cir. 1988).**

This is not a situation where the ALJ failed to consider or discuss the opinions of the treating or examining physicians. The ALJ found the opinions inconsistent with substantial objective medical evidence, which the applicable regulations permit the ALJ to do.

Clearly, an ALJ may not "play doctor" by substituting her opinion for that of a physician. ***See, e.g., Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003).** Rather, the ALJ must weigh the evidence before her and make appropriate inferences from that evidence. That is precisely what happened here. The ALJ gave specific sound reasons for rejecting Dr. Amorado's March 2005 assessment. Neither the ALJ nor Magistrate Judge Frazier incorrectly weighed the opinions of Pound's physicians.

> ▶   Objection 3: The Magistrate Judge improperly applied "post hoc rationalization to the RFC analysis."

This objection is wholly devoid of merit. Pound complains that Magistrate Judge Frazier *relied on* Pound's alleged operation of a bulldozer and other activity as undermining Pound's credibility, "while it was by no means clear" the ALJ found these factors significant in her credibility assessment (Doc. 15, p. 3). Judge Frazier's R&R refers to Pound's operation of the bulldozer, her operation of a riding lawnmower, and her ability to perform outside work on her Rend Lake farm as contradicting Amorado's assessment of Pound's ability to sit, stand and lift (Doc. 13, p. 16). Pointing out that contradiction does not invalidate Judge Frazier's analysis in the thorough 16-page R&R.

Furthermore, these activities were fair game for consideration. They appeared in the medical record before the ALJ and this Court – specifically in the records from Pound's June 1999 visit to Dr. Neff and her July 2003 office visit with Dr. Amorado.

Plenty of evidence in the record (about Pound's abilities, activities and limitations) supported the ALJ's finding that Pound's complaints lacked credibility. The ALJ's decision (and her credibility determinations) were not predicated on Pound's one-time operation of a bulldozer. Judge Frazier did not leap to after-the-fact conclusions about what the ALJ relied on in making her decision.

### D.   Conclusion

When she appeared at hearing before ALJ Pritchett, Christine Pound had not worked since July 6, 1998, her insurance had expired on December 31, 2003, and she had only applied for disability insurance benefits on November 24, 2004. The ALJ asked Ms. Pound why – if she believed she was disabled in July 1998 – did she wait six years to apply for benefits. Interestingly, Pound replied that she never thought she was disabled, and she thought her medical problems were temporary.

Pound called as a witness her mother, Joyce Bateman, who testified that she did most of the cleaning, most of the cooking, and all of the shopping. Pound also presented the testimony of a vocational expert, Darrell W. Taylor, an Associate Professor at Southern Illinois University, who opined that, given all her limitations, Pound could not perform any jobs. And Pound presented medical evidence, focusing on the opinions of Dr. Amorado and Dr. Raino.

The ALJ determined that Pound had several severe impairments, including coronary artery disease, carotid artery disease, and degenerative disc disease. The ALJ determined that those impairments limited Pound's ability to perform exertional activities and basic work functions. But the ALJ further found that Pound's "medically determinable impairments could have been reasonably expected to produce only some of the alleged symptoms," and Pound's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (ALJ's decision at page 6). The ALJ additionally noted that Pound's "daily activities prior to her date last insured, as described in the objective medical records, were not consistent with her allegations" (*Id.*, p. 8).

The ALJ fully considered Mrs. Bateman's testimony and found it "unsupported by any other evidence" and "less than fully credible" (*id.*). After finding that Pound's primary impairments prior to her DLI were her coronary artery disease and carotid artery disease and assessing the limitations those impairments did place on Pound's ability to work, the ALJ stated: "There is no objective evidence to support greater limitations, as [Pound] did not exhibit any neurological or mental deficits prior to the date last insured" (*id.*, p. 9).

The ALJ concluded that Pound did **not** have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found that Pound retained the RFC to perform a full range of sedentary work. The ALJ ultimately concluded that Pound was not under

Page 14 of 15

a disability at any time from her alleged onset date to her DLI.

The undersigned Judge may not re-weigh the extensive factual record or judge for himself the credibility of each witness who appeared at the hearing. This Court asks only whether substantial evidence supported the ALJ's conclusion. *See Overman v. Astrue,* **546 F.3d 456, 462 (7th Cir. 2008).** The answer is yes. The ALJ weighed the evidence, made credibility assessments, evaluated the testimony and properly applied the multi-step analytical framework. The ALJ's findings are "sufficiently detailed that we are able to trace [her] path of reasoning." *Schmidt v. Barnhart,* **395 F.3d 737, 747 (7th Cir. 2005).**

Accordingly, the Court **ADOPTS** Magistrate Judge Frazier's R&R (Doc. 13) and **AFFIRMS** the ALJ/Commissioner's decision. Judgment shall be entered against Pound and in favor of the Commissioner herein.

IT IS SO ORDERED.

DATED March 2nd, 2010.

s/ *Michael J. Reagan*
Michael J. Reagan
United States District Judge